UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | |
| CRUTCHER-TUFTS RESOURCES, INC. | CASE NO. 03-17408 |
| Debtor | SECTION B<br>CHAPTER 11<br>INVOLUNTARY |
| _____ | |
| IN RE: | |
| CRUTCHER TUFTS RESOURCES, L.P. | CASE NO. 03-17409 |
| Debtor | SECTION B<br>CHAPTER 11<br>INVOLUNTARY<br>Jointly Administered |
| _____ | |
| TREVOR G. BRYAN, AS<br>RESPONSIBLE PARTY OF<br>CRUTCHER-TUFTS RESOURCES, INC.<br>and CRUTCHER-TUFTS RESOURCES, L.P. | ADVERSARY PROCEEDING |
| Plaintiffs | CASE NO. 04-1161 |
| VERSUS | SECTION B |
| TUFTS OIL & GAS-III, L.P. ET AL | |
| Defendants | |
| _____ | |

**MEMORANDUM OPINION**

This matter came before the court on June 13 through 16, 2005 as a trial on the

complaint of Trevor G. Bryan, as responsible party of Crutcher-Tufts Resources, Inc. and Crutcher-Tufts Resources, L.P., the debtors, seeking declaratory judgment as to whether defendant Tufts Energy, LLC has a limited partnership interest in Crutcher-Tufts Resources, L.P.  For the reasons expressed, the court finds that section 13 of the management agreement contains a valid suspensive condition, but that the evidence does not support a finding that the fulfillment of that condition was frustrated by either Crutcher-Tufts Resources, L.P. or Crutcher-Tufts Resources, Inc.

I. **Background Facts**

Crutcher-Tufts Resources, Inc., ("CRT-Inc.") is the general partner in Crutcher-Tufts Resources, L.P., ("CTR-LP").  Both entities are businesses owned in part by various members of the Crutcher family and the Tufts family.[1]  J. David Tufts, III ("David Tufts") indirectly holds an interest in CTR-Inc., sits on its board of directors and is its president and assistant secretary.  The other board members of CTR-Inc. at the relevant time were Fred Tufts, Robert Tufts, Albert Crutcher, Mary Crutcher and James Reiss, Albert Crutcher's son-in-law.  Tufts Energy is an enterprise that is owned and controlled by David Tufts.  CTR-LP and Tufts Energy entered into a

---

[1] CTR-Inc. is owned by the J. David Tufts, III and Claudia Liberto Tufts Children's Trust (200 shares), the JDT/RGT Family Trust (400 shares) and the 241 Trust (400 shares).  The limited partners of CTR-LP are Tufts Oil & Gas, L.P., Crutcher Oil & Gas-III, L.P., JDT/CLT Family Trust, GPH/LTH Family Trust, Succession of Penelope Becker, Priscilla Eaves Reiss, John Crutcher, Michael E. Rodan, Cathy Rodan Bowman, Charles A. Dobie, Dennis E. Weiss and Crutcher-Tufts Resources, Inc.

management agreement on July 7, 2000. The management agreement was drafted primarily by Jeff Zlotky, an attorney with Thompson & Knight, at the direction of David Tufts. There was minimal, if any, input from either CTR-LP, the counter-party to the agreement or the other board members of CTR-Inc., who were required to vote on the agreement. Testimony at trial showed that the other board members were not given a draft of the management agreement until July 6, 2000, one day before the board had to vote on the agreement. The agreement provided that Tufts Energy, as manager, would supply "general and administrative management services" to CTR-LP as defined in section 2 of the management agreement.[2] Section 5 of the agreement, entitled "Compensation" further provides: "In consideration of the performance of the General and Administrative Services pursuant hereto, the Partnership shall pay the Manager the G&A Payment in advance of each month on or before the first day of each month."[3] The agreement was approved by a majority of the board of directors of CTR-Inc.,[4] and Albert Crutcher was designated as the representative with the

---

[2] Trial Exhibit 122.

[3] *Id* at p. 4.

[4] Only Fred Tufts, David Tufts brother, voted against the resolution authorizing the agreement.

authority to execute the agreement.[5]

After entering into the agreement, Tufts Energy apparently provided management services to CTR-LP for approximately two years, receiving regular G&A payments of $66,667 per month as set forth in the agreement. The parties do not contend that Tufts Energy did not perform its management duties, nor do they contend that the CTR-LP failed to pay Tufts Energy according to the agreement.

Section 9 of the agreement provided:

The initial term of this Agreement shall extend from the date hereof to the close of business on June 30, 2002, provided that this Agreement shall continue thereafter for successive one-year terms ending on the close of business on June 30 of each succeeding year unless either the Partnership or the Manager shall elect to terminate this Agreement upon at least 90 days written notice to the other party prior to June 30 of any such succeeding year.[6]

On March 7, 2002, the board of directors of CTR-Inc. met and voted not to renew the agreement, and thus the agreement was to expire on June 30, 2002. On March 15, 2002, David Tufts called a board meeting that resulted in a resolution that removed Fred Tufts and James Reiss from the board and replaced them with David Tufts' wife and mother. This new board then voted to reinstate the management agreement.

---

[5] David Tufts abstained from the board's vote because of his interest in Tufts Energy, the counter-party to the contract. He also was not able to act as the president of CTR-LP for purposes of executing the contract because of his interest in Tufts Energy.

[6] Trial Exhibit 122 at page 6.

4

Litigation concerning the validity of this action was pursued by the parties in a state court proceeding entitled *Albert B. Crutcher, et al. v. J. David Tufts, III, et al.,* No. 2003-9838, Division N, Civil District Court, Orleans Parish. The proceeding was a *quo warranto* action as to the validity of the board meeting and the resolution changing the board's composition. On February 16, 2005, the Louisiana Fourth Circuit Court of Appeal issued an opinion and entered a final judgment that the resolution attempting to remove the members of the CTR-Inc. board was invalid.[7] This meant that the March 7, 2002 vote by the old board not to renew the agreement was valid, and the management agreement expired on June 30, 2002.

The bone of contention in this adversary proceeding is none of the above but instead section 13 of the agreement, which reads:

> Right to Earn Partnership Interest in the Partnership. The Manager shall have the right to earn twenty five percent (25.0%) of the equity of the Partnership upon the achievement by the Partnership of mutually acceptable performance criteria to be agreed upon by the board of directors of the general partner of the Partnership and the Manager and as acceptable to the lenders under the Senior Credit Agreement and the Subordinated Credit Agreement, and in conjunction with a mutually acceptable independent third party consultant (giving due consideration to the amount of the G&A Payment as compared to the Manager's actual costs of rendering services pursuant to this Agreement).[8]

The parties strenuously disagree as to the effect of section 13. The responsible party

---

[7] *Crutcher v. Tufts,* 898 So.2d 529 (La. App. 4 Cir. 2005).

[8] Trial Exhibit 122 at page 8.

5

argues that section 13 is simply an agreement to agree and as such is not an enforceable provision of the contract. Tufts Energy argues that section 13 of the agreement is a valid suspensive condition, the fulfillment of which was frustrated by CTR-LP. Tufts Energy further argues that under Louisiana Civil Code Article 1772, the result of this frustration is that the condition is deemed fulfilled, and it is entitled to a 25% interest in CTR-LP.

Prior to beginning the trial on the complaint of the responsible party, the court limited the issues to be presented at trial to 1) whether section 13 of the management agreement constitutes a purely potestative or simply potestative condition; and, 2) whether, if the provisions of section 13 of the management agreement are determined to be a simply potestative condition, performance of the condition was frustrated solely by the acts of Crutcher-Tufts Resources, Inc. and Crutcher-Tufts Resources, L.P.[9]

## II. Legal Analysis

### A. Purely or Simply Potestative

According to the court's order of May 12, 2005, the first of two issues to be decided is whether section 13 of the management agreement constitutes a purely potestative or simply potestative condition under the governing law contained in the

---

[9] Order dated May 12, 2005 (P-161).

Louisiana Civil Code. The court's order was in response to the parties' motion to limit the issues to be tried and the accompanying briefs.[10] Upon analyzing the relevant Civil Code articles, however, the court finds that the concept of simply and purely potestative conditions no longer exists under Louisiana law. Thus, the court analyzes the following articles of the Louisiana Civil Code instead.

**1.      Louisiana Civil Code Articles 1767 and 1770**

The 1985 revisions to the Louisiana Civil Code specifically address conditional obligations in Articles 1767 to 1776.[11] Article 1767 defines suspensive and resolutory conditions.[12] Although the definition of suspensive and resolutory conditions did not substantively change with the revisions, their treatment in certain circumstances did. Under the pre 1985 articles of the Civil Code, a suspensive or resolutory condition could be either casual, potestative or mixed.[13] The potestative condition was defined as "that which makes the execution of the agreement depend on an event which it is

---

[10] The parties initially framed the issue as a determination of whether or not the condition was simply or purely potestative, and it was only after the court ruled to set the issues for trial that the parties began referencing the new Civil Code articles.

[11] Pursuant to Acts 1984, No. 331 § 1, effective January 1, 1985, Title III of Book III of the Louisiana Civil Code of 1870, "Of Obligations" was revised.

[12] LSA C.C. Art. 1767: "A conditional obligation is one dependant on an uncertain event. If the obligation may not be enforced until the uncertain event occurs, the condition is suspensive. If the obligation may be immediately enforced but will come to an end when the uncertain event occurs, the condition is resolutory."

[13] LSA C.C. Art. 2022 (1870).

7

in the power of the one or the other of the contracting parties to bring about or to hinder."[14] Article 2034 of the pre 1985 Civil Code then stated "Every obligation is null, that has been contracted, on a potestative condition, on the part of him who binds himself." The next article distinguished between purely and simply potestative conditions, holding that not all potestative conditions were null."[15]

The current version of the Civil Code, in Article 1770, eliminates the term "potestative," and instead focuses on the concepts of "whim" and "will."[16] Comment (e) to Article 1770 states that the purpose of the article is to recast the concepts surrounding simply and purely potestative conditions in the pre 1985 Civil Code in terms of an implicit dichotomy between the obligor's "whim," that is, his exercise of mere unbridled discretion or arbitrariness and his "judgment," or exercise of a considered and reasonable discretion. The comments further explain that the potestative concept was replaced in the Civil Code by the 1985 revisions because of

---

[14] LSA C.C. Art. 2024 (1870).

[15] LSA C.C. Art. 2035 (1870): "The last preceding article is limited to potestative conditions, which make the obligation depend solely on the exercise of the obligor's will; but if the condition be, that the obligor shall do or not do a certain act, although the doing or not doing of the act depends on the will of the obligor, yet the obligation depending on such condition, is not void."

[16] See LSA C.C. Art. 1770: "A suspensive condition that depends solely on the whim of the obligor makes the obligation null. A resolutory condition that depends solely on the will of the obligor must be fulfilled in good faith."

the confusion it engendered and the difficulties the concept caused in Louisiana jurisprudence with respect to the treatment of conditions.[17]

In keeping with the changes to the Civil Code, the court will not determine whether section 13 is a purely or simply potestative condition but instead will address Section 13 of the agreement in terms of the post-revision Civil Code articles. The court finds that section 13 contains a suspensive condition. The uncertain event is "the achievement by the Partnership of mutually acceptable performance criteria." Upon the occurrence of that event, the obligation, i.e., the manager's right to earn 25% of the equity of the partnership, may be enforced, but the suspensive obligation may only be enforced when the uncertain event occurs. In the instant case, no party argues that the uncertain event has occurred. No mutually acceptable performance criteria were ever established by CTR-LP whereby Tufts Energy could earn 25% of the equity of CTR-LP.

The court then turns to Article 1770, which states: "A suspensive condition that depends solely on the whim of the obligor makes the obligation null." The responsible party and various other interested parties in this proceeding argue that section 13 depends solely on the whim of CTR-LP, and is therefore null. Tufts Energy argues that section 13 does not depend solely on the whim of CTR-LP, and is

---

[17] See LSA C.C. Art. 1770 comment (e).

not null. The court finds the latter argument is the better position. The language of section 13 reads that the right to earn the 25% equity interest depends upon the "achievement by the Partnership of mutually acceptable performance criteria to be agreed upon by the board of directors of the general partner of the Partnership and the Manager and as acceptable to the lenders under the Senior Credit Agreement and the Subordinated Credit Agreement, and in conjunction with a mutually acceptable third party consultant."

The court finds that the terms of section 13 do not depend on the whim of CTR-LP as whim is used in article 1770. Comment (d) to Article 1770 states:

> An event which is left to the obligor's whim is one whose occurrence depends entirely on his will, such as his wishing or not wishing something. An event is not left to the obligor's whim when it is one that he may or may not bring about after a considered weighing of interest, such as his entering into a contract with a third party.

Section 13 does not state and cannot be read fairly to mean that the manager has the right to earn a 25% equity interest only if CTR-LP wishes it. Rather, the manager *shall* have the right to earn the 25% equity interest, and this right is conditioned upon the agreement of criteria to be determined by two parties (the partnership and the manager), with the input of a third (a mutually acceptable independent third party consultant), and the veto rights of a fourth party (the lenders). CTR-LP does not retain unbridled discretion to put forth any criteria it wishes. The criteria must be

agreed to by the manager and approved by the lenders under the Senior and Subordinated Credit Agreements. Ostensibly the performance criteria should relate to the performance of some act by the manager that has value to the partnership, and in return for such act, the partnership would grant the manager a 25% equity interest. This would place the development of the performance criteria in the category of a condition that CTR-LP "may or may not bring about after a considered weighing of interest."[18] For example, CTR-LP cannot unilaterally decide that the manager's 25% equity is to be earned by requiring David Tufts to scale Mount Everest, because neither Tufts Energy nor the lenders would agree to that as a mutually acceptable performance criteria, and thus, that criteria would be unenforceable. The respective abilities of Tufts Energy to have input and the lenders to have veto power in the achievement of the performance criteria leads the court to the conclusion that the suspensive condition does not solely depend on the whim of the obligor, and as such, it is not null under the provisions of Article 1770.

Additionally, the performance criteria giving rise to the right to earn the 25% equity interest is to be determined in part by "giving due consideration to the amount of the G&A Payment as compared to the Manager's actual costs of rendering the services pursuant to th[e] Agreement." The amount of the G&A payment compared

---

[18] LSA C.C. Art. 1770 comment (d).

to the actual costs of rendering services is a factor that must be considered by the partnership when determining the performance criteria. If CTR-LP is required to take concrete factors such as this into account when determining the performance criteria, it cannot be said that the decision is entirely dependent on the whim of CTR-LP.

**2. "Frustration" under Louisiana Civil Code Article 1772**

Holding that section 13 of the agreement is a valid suspensive condition necessitates an analysis of Tufts Energy's second argument that is grounded on article 1772, which reads: "A condition is regarded as fulfilled when it is not fulfilled because of the fault of a party with an interest contrary to the fulfillment." Tufts Energy argues that the fulfillment of section 13 of the agreement was frustrated by CTR-LP through the actions of Albert Crutcher in his capacity as the "designated officer" of CTR-LP.[19]

The responsible party, arguing on behalf of CTR-Inc. and CTR-LP, contends that CTR-LP did not frustrate the fulfillment of section 13. Rather, the argument put forth in defense of CTR-LP is that initially it was never asked to develop performance criteria, and that even had it wanted to develop criteria, it was prevented from doing so by David Tufts' refusal to provide certain data related to the G&A expenses

---

[19] As noted above, David Tufts, although president of CTR-Inc., was not able to represent CTR-LP with respect to the management agreement because of his conflicted position as the owner of Tufts Energy.

incurred by Tufts Energy in the course of performing its duties under the management agreement. The responsible party argues that this data was critical to the ability of CTR-LP to assess Tufts Energy's performance and develop appropriate performance criteria under section 13. The language in section 13 as to the actual cost of the G&A expense was added at the request of Albert Crutcher because he thought the $800,000 annual figure was too high for the G&A payment and wanted CTR-LP to analyze the G&A payment before agreeing to additional compensation for Tufts Energy.

 David Tufts and Robert Tufts both testified that they raised the issue of the development of performance criteria at the CTR board meeting on May 23, 2001, as well as at other times. Fred Tufts, Albert Crutcher and James Reiss testified that the issue was never discussed at any CTR board meeting. They also denied that David Tufts had approached them even outside board meetings to discuss performance criteria. David Tufts testified that he could not point to any minutes of board meetings that would support his testimony, and indeed the minutes of the CTR-Inc. board meetings do not reflect that the development of performance criteria was ever discussed. Nor could David Tufts point to any documents supporting his testimony even though numerous documents were produced for purposes of this trial. As president of the board of CTR-Inc., David Tufts was responsible for setting the agenda of the board meetings; he could have adjusted the agenda for any of the board

13

meetings to include a discussion and/or vote on the issue of the mutually acceptable performance criteria, but he did not. As assistant secretary, he was also responsible for keeping records of board meetings. If he failed to keep accurate minutes and that later worked to his detriment, he has only himself to blame. The court finds that the evidence presented at trial does not support Tufts Energy's contention that either CTR-LP, CTR-Inc. or any officer of the corporation refused to discuss the performance criteria, frustrating the fulfillment of the suspensive condition under Article 1772.

Albert Crutcher testified that on February 19, 2002 he requested data related to the G&A expenses from David Tufts so that an evaluation of that data could be made. This request was explained as an attempt to begin discussing the performance criteria in accordance with the provision of section 13 that required any performance criteria to be developed "giving due consideration to the amount of the G&A Payment as compared to the Manager's actual costs of rendering the services pursuant to this Agreement." In stark contrast to the lack of written evidence on the part of Tufts Energy to support its contentions, Albert Crutcher points to both a letter he wrote requesting the data,[20] and a letter written by David Tufts in response, in which David

---

[20] Trial Exhibit 187.

Tufts stated that he had no obligation to provide the requested data.[21]  Although David Tufts also stated in the letter that he was nonetheless willing to provide the data, he did not in fact do so despite repeated requests from Albert Crutcher.[22]   David Tufts admitted in his testimony that he knew that the language in section 13 meant that Tufts Energy had an obligation to furnish the actual costs of rendering the services but weakly argued that he read the language as requiring that the information be furnished in connection with an independent third party consultant.  The court finds that this evidence further supports a finding that CTR-LP did not frustrate the negotiation of the performance criteria.

Tufts Energy contends that because Albert Crutcher had an interest in an entity that was a limited partner in CTR-LP, he had an interest contrary to enabling Tufts Energy to earn a limited partnership interest in CTR-LP.  Tufts Energy contends that if it were allowed to earn a 25% interest in the partnership, the interests of Albert Crutcher would be reduced, and this led to his opposition to any attempts to negotiate mutually acceptable performance criteria.  As stated above, David Tufts testified that whenever he tried to discuss performance criteria with Albert Crutcher he was

---

[21]  Trial Exhibit 196.

[22]  The February 19, 2002 letter, Exhibit 187, was the first of three written requests by Mr. Crutcher for the data.  See letters of March 15, 2002, Exhibit 201, and January 14, 2003, Exhibit 216.

15

rebuffed. Tufts Energy asserts, correctly, that under Delaware law, a corporation can only act through its officers and agents.[23] Tufts Energy also asserts that Albert Crutcher in his capacity as the "designated officer" of CTR-Inc. acted to frustrate the suspensive condition of developing performance criteria. Tufts Energy's argument ignores, however, that while Albert Crutcher may have had interests in CTR-Inc., the general partner, and CTR-LP, the counter-party to the management agreement, at least Albert Crutcher's interests were all on the side of the corporate entity and partnership he was representing.

Charges of conflicting interest on the part of Albert Crutcher do not come well from David Tufts. He was a member of the board of CTR-Inc., as well as its president and assistant secretary; he too had an indirect limited partnership interest in CTR-LP.[24] He was in addition, however, the owner of Tufts Energy. As such, his actions in drafting a contract between two parties in which he had an interest are subject to greater scrutiny than the actions of a non-conflicted board member. David Tufts put himself into a precarious position when he orchestrated this deal, and as an attorney and experienced businessman, he should have recognized that. Instead, he pushed

---

[23] *Hessler, Inc. v. Farrell*, 226 A.2d 708 (Del. 1967).

[24] David Tufts was also the trustee of certain trusts described in footnote 1 and owed a fiduciary duty to the beneficiaries to prevent an unearned issuance of an equity interest in CTR-LP that diluted the percentage of equity interest owned by the trusts.

through a management agreement that, although drafted by CTR-Inc.'s attorney, was essentially dictated by him. David Tufts fully recognized his conflicting interest and tried to claim that the lenders required the manager to have an interest in the partnership. Even if the court accepted the position that the 25% equity interest Tufts Energy hoped to earn was the idea of the lenders, it carries little or no weight on the issue of David Tufts' conflict of interest in directing the attorney for CTR-Inc. to prepare a contract that was in David Tufts' best interest. No one else from CTR-Inc.'s board saw the agreement until the day before they were requested to vote on the agreement. The evidence shows the board was uncomfortable with some of the language of the agreement, particularly the amount of the G&A payment, as shown by the changes to it before the final version was signed.

To now complain that Albert Crutcher, acting on behalf of CTR-LP, frustrated the development of mutually acceptable performance criteria because he had a personal interest contrary to the development of those criteria is a rather disingenuous argument. That Tufts Energy has been so unwilling to provide meaningful information to CTR-LP and the CTR-Inc. board of directors both prior to and after the execution of the management agreement does not help its argument. Conjecture about how Albert Crutcher may have had an interest adverse to Tufts Energy because he did not want his limited partnership interest in CTR-LP diluted is not evidence of an

adverse interest. Tufts Energy introduced no evidence to support these contentions, and thus, did not carry its burden of proof.

The court finds that by requesting the G&A expenses in order to conduct an examination of the actual expenses of Tufts Energy with respect to its performance of the management agreement, Albert Crutcher was fulfilling his fiduciary duties in a responsible way. To have allowed Tufts Energy to receive a 25% equity interest in CTR-LP without an examination of what services it was performing and how it was being compensated for those services would have been to act against the interests of CTR-LP and its general partner, CTR-Inc.

The court finds that Tufts Energy, as the party seeking to prove frustration, carried the burden of proof. The court further finds that Tufts Energy failed to carry this burden. While it is possible that Albert Crutcher did defer or even refuse to discuss performance criteria with David Tufts, the only evidence to show that is the testimony of David and Robert Tufts. Their statements were vague and uncertain as to the times that David Tufts requested such a discussion and were contradicted by testimony from Fred Tufts, Albert Crutcher and James Reiss. The documents entered into evidence at trial do not reflect that David Crutcher requested and Albert Crutcher refused to discuss the performance criteria. Rather, they show that Albert Crutcher requested G&A information from David Tufts and did not receive it. As section 13

is written, the parties were to consider that information when discussing performance criteria. To request the information required to make a reasoned decision involving the finances of CTR-LP is not an attempt to frustrate a condition, rather it is good business judgment. David Tufts appears to have let his interest in Tufts Energy conflict with his role as president and director of CTR-Inc., in that he had a fiduciary responsibility to that entity that he appears to have forgotten in his haste to benefit Tufts Energy.

### III.  Conclusion

For the reason expressed above, the court finds that section 13 of the management agreement is a valid suspensive condition. Further the court finds that the evidence does not support a finding that the fulfillment of that condition was frustrated by either Crutcher-Tufts Resources, L.P. or Crutcher-Tufts Resources, Inc., or that Albert Crutcher in his capacity as the designated representative of CTR-LP acted to frustrate the fulfillment of section 13.

New Orleans, Louisiana, November 15, 2005.

*J. A. Brown*
Jerry A. Brown
U.S. Bankruptcy Judge